UNITED STATES BANKRUPTCY COURT

MIDDLE DISTRICT OF FLORIDA

(TAMPA DIVISION)

www.flmb.uscourts.gov

| | |
|---|---|
| In re | Case No. 8:23-bk-02914-RCT |
| LYNNE AI BUI, | Chapter 11 |
| Debtor. | |
| ZIONS BANCORPORATION, N.A. D/B/A | |
| CALIFORNIA BANK & TRUST, | |
| Plaintiff, | Adv. Proc. No. 8:23-ap-00170-RCT |
| vs. | |
| LYNNE AI BUI, | |
| Debtor. | |

**PLAINTIFF ZIONS BANCORPORATION, N.A. D/B/A CALIFORNIA BANK & TRUST'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY ADJUDICATION ON DETERMINATION OF NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523**

Plaintiff Zions Bancorporation, N.A. d/b/a California Bank & Trust (the "Plaintiff"), through counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure, and Rule 7001-1 of the Local Rules of the U.S. Bankruptcy Court for the Middle District of Florida moves (the "Motion") for an order granting summary judgment in favor of the Plaintiff and against Lynne Ai Bui, debtor in the above-captioned chapter 11 bankruptcy case and defendant in the above-captioned adversary proceeding (the "Debtor"), as to the dischargeability of the Plaintiff's claims against the Debtor under Sections 523(a)(2)(A) and (B) and (a)(6) of 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. JURISDICTION AND VENUE ............................................................................2

III. STATEMENT OF UNDISPUTED FACTS .........................................................3

    A.    The commencement of the Debtor's Bankruptcy Case and the Plaintiff's adversary proceeding against the Debtor. ................................................3

    B.    In September 2020, the Debtor submits her Personal Financial Statement to the Plaintiff to obtain a Home Equity Line of Credit. ...............................................4

    C.    After the submission of the Financial Statement and loan application, the Debtor obtains a $2.61 million home equity line of credit. ....................................6

    D.    Following the approval of the Loan Application, the Debtor obtains a $2.61 million home equity line of credit from the Plaintiff. ..............................7

    E.    The Debtor fraudulently induced the Plaintiff to extend the HELOC Loan based on multiple omissions and misrepresentations during the application process. .................................................................................9

        1.    The Debtor fails to disclose over $11 million in personal liabilities and other relevant financial information her Financial Statement. ..............9

        2.    Prior to the execution of the Debtor's Certificate, the Debtor failed to disclose additional material information respecting her finances. .............13

    F.    The Debtor transfers the Saratoga Property in violation of the Loan Documents and to the ultimate detriment of the Plaintiff. ....................................16

        1.    The Debtor transfers the Saratoga Property from the Bui Revocable Trust to her consulting company and then to herself. ...............................16

        2.    Following the transfers, the Debtor obtains a second loan to be "secured" by the Saratoga Property from Kelly Mortgage, Inc. ................17

    G.    The Debtor's fraudulent scheme continued after the funding of the HELOC Loan through the commencement of the Debtor's Bankruptcy Case. ..................18

        1.    The Examiner uncovers a web of new entities and properties as part of the Debtor's fraudulent scheme. ...........................................................18

2.      The Debtor incurs over $25 million in loan or guaranty obligations following the funding of the HELOC Loan in connection with the Debtor's fraudulent scheme. .................................................................20

H.      Multiple events of default have occurred under the Loan Documents. .................21

IV.     LEGAL ARGUMENT ......................................................................................................23

A.      The Plaintiff has met the legal standard on summary judgment. ............................23

B.      The Plaintiff is entitled to summary judgment under section 523(a)(2)(A). .........24

1.      The Debtor's misrepresentations and fraudulent scheme. .........................32

2.      The Plaintiff relied on the Debtor's misrepresentations ...........................34

3.      The Plaintiff's justifiable reliance. ............................................................35

4.      The Plaintiff sustained loss as a result of the Debtor's misrepresentations. ......................................................................................35

C.      The debt also is nondischargeable under section 523(a)(2)(B). ...........................24

1.      The statements were in writing. .................................................................25

2.      The statements were materially false. ........................................................26

3.      The statements involved the Debtor and its insider's financial condition. ....................................................................................................29

4.      The Plaintiff reasonably relied on the statements in extending credit. ......29

D.      The debt is nondischargeable under section 523(a)(6). .........................................36

V.     CONCLUSION ...............................................................................................................38

BUCHALTER 106627887v4

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................23

*Brown v. Ables* (*In re Ables*),
   302 B.R. 917 (Bankr. M.D. Fla. 2003) (Williamson, J.) .......................................31

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548 (1986)..................................................................23

*Coston v. Bank of Malvern (In re Coston)*,
   991 F.2d 257 (5th Cir. 1993) ...........................................................................29

*Field v. Mans*,
   516 U.S. 59 (1995).............................................................................29, 31, 34

*Greenberg v. BellSouth Telecomms., Inc.*,
   498 F.3d 1258 (11th Cir. 2007) (per curiam)........................................................23

*Grogan v. Garner*,
   498 U.S. 279 (1991)........................................................................................24

*Hawking v. Ford Motor Credit Co.*,
   210 F.3d 540 (5th Cir. 2000) ...........................................................................24

*Husky International Electronics, Inc. v. Ritz*,
   578 U.S. 355 (2016)........................................................................................33

*In re Ikner*,
   883 F.2d 986 (11th Cir. 1989) ...........................................................................36

*Ins. Co. of N. Am. v. Cohn (In re Cohn)*,
   54 F.3d 1108 (3d Cir. 1995)..............................................................................30

*Jean-Baptiste v. Gutierrez*,
   627 F.3d 816 (11th Cir. 2010) ...........................................................................23

*In re Jennings*,
   670 F.3d 1329 (11th Cir. 2012) .........................................................................36

*Kawaauhau v. Geiger*,
   523 U.S. 57 (1998).........................................................................................36

*Lamar, Archer & Cofrin, LLP v. Appling*,
    138 S. Ct. 1752 (2018) ........................................................................29

*Martin v. Bank of Germantown (In re Martin)*,
    761 F.2d 1163 (6th Cir. 1985) ...........................................................30

*Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*,
    416 F. Supp. 3d 1369 (S.D. Fla. 2019) ..............................................23

*Posillico v. Bratcher (In re Bratcher)*,
    281 B.R. 753 (Bankr. M.D. Fla. 2002) ..............................................24

*SEC v. Bilzerian (In re Bilzerian)*,
    153 F.3d 1278 (11th Cir. 1998) .........................................................31

*U.S. v. Recker*,
    180 B.R. 540 (Bankr. E.D. Mo. 1995) ...............................................36

*Waddell v. Valley Forge Dental Assocs., Inc.*,
    276 F.3d 1275 (11th Cir. 2001) .........................................................23

**Federal Statutes**

11 U.S.C. ........................................................................................................2

11 U.S.C.
    § 523 ...................................................................................................2, 36
    § 523(a)(2) ........................................................................................24, 29
    § 523(a)(2)(A) ......................................................................29, 31, 33, 36
    § 523(a)(2)(B) ................................................................................. *passim*
    § 523(a)(6) ......................................................................................36, 38
    § 727 .................................................................................................2, 24

28 U.S.C.
    § 157(a) .....................................................................................................3
    § 157(b)(2)(I) ...........................................................................................3
    § 157(b)(2)(A) .........................................................................................3
    § 157(b)(2)(J) ...........................................................................................3
    § 1334(a) and (b) .....................................................................................3
    § 1409(a) ..................................................................................................3

**Rules**

FED. R. BANKR. P. 7056 ...............................................................................23

FED. R. CIV. P. 56 ........................................................................................23

FED. R. CIV. P. 56(a) ...................................................................................23

iv

**Other Authorities**

Debtor's Certification ......................................................................................................................6

**MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES**

As grounds for the relief requested in this Motion, the Plaintiff relies on the filings and pleadings in this case, the Declaration of Matthew Snell (the "Snell Decl."), the Declaration of Scott Tanner (the "Tanner Decl."), and the Request for Judicial Notice ("RJN") filed concurrently herewith and incorporated herein by reference.  In support of the Motion, the Plaintiff states:

## I.      INTRODUCTION

This Bankruptcy Case has been complex and the facts developed relating to the true condition of the Debtor's financial history have been hard earned.  While the complexity of the Debtor's myriad trusts, entities, real properties, loans and transfers is well-documented in the Bankruptcy Case, the overview of the Plaintiff's nondischargeability claims is fairly straightforward.

The Plaintiff's claims arise out of the Debtor's application for a $2.61 million home equity line of credit from the Plaintiff to be  secured by the Debtor's real property in Saratoga, California, which was titled in the name of her U.S. revocable trust.   In September 2020, the Plaintiff submitted a Personal Financial Statement to the Plaintiff representing her assets, liabilities and income.  This Financial Statement contained multiple misrepresentations and omissions, including the Debtor's failure to disclose the Debtor's offshore Pemberley Trust, the existence of multiple entities, business investments and real properties that the Debtor directly or indirectly owned, as well as over $5 million in obligations that the Debtor had personally guaranteed.

These misrepresentation and omissions continued throughout the Plaintiff's application process over the course of approximately nine months and were the hidden seed of a fraudulent scheme to rapidly invest borrowed funds in even more investments and real properties, in both the U.S. and abroad, through the Debtor's web of U.S. and foreign trusts and entities.  Between September 2020 and the Plaintiff's funding of the HELOC Loan one year later, the Debtor's scheme grew exponentially, adding four new entities, two new real properties, and five loans totaling $34,585,000 in new, personal obligations, all of which were not disclosed to the Plaintiff. After the Debtor had taken the Plaintiff's loan proceeds and pledged her Saratoga Property to

secure the debt, the Debtor twice transferred the Plaintiff's collateral to an affiliate and then to herself, at which time she obtained a $3 million loan in her own name, secured by a junior lien on the collateral, all without the Plaintiff's knowledge or consent.  Between the funding of the loan and the Petition Date, the Debtor's scheme had added another six U.S. and foreign entities, seven real properties, and seven new loans adding $4,928,000 to her total personal obligations.

As detailed herein, the Debtor's actions require this Court to deem her obligations to the Plaintiff nondischargeable under sections 523(a)(2)(A) and (B), and 523(a)(6).[1]

## II.    JURISDICTION AND VENUE

1.      The Debtor filed her voluntary bankruptcy petition under chapter 11 of the Bankruptcy Code on July 10, 2023 (the "Petition Date") commencing the above-captioned bankruptcy case designated as *In re Lynne AI Bui*, Case No. 8:23-bk-02914-RCT (the "Bankruptcy Case").  *See* Bk. Docket No. 1[2]; *see also Defendant's Answer and Affirmative Defenses to Complaint for: (1) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523; and (II) Objection to Discharge Pursuant to 11 U.S.C. § 727* [Adv. Docket No. 6] (the "Debtor's Answer"), ¶ 1 (admitted), a copy of which is attached as **Exhibit 2** to the RJN.

2.      The *Notice of Chapter 11 Bankruptcy Case* [Bk. Docket No. 6] directed any party in interest objecting to the Debtor's discharge or seeking a determination of the dischargeability of its debt to file its complaint by October 10, 2023.  *See* Debtor's Answer, ¶ 2 (admitted).

3.      On October 10, 2023, the Plaintiff filed its Complaint against the Debtor [Adv. Docket No. 1] (the "Complaint") and initiated the above-captioned adversary proceeding (the "Adversary Proceeding") pursuant to Bankruptcy Rules 7001(4), Rule 7001(6), and 4007(c) asserting causes of action arising under Section 523 and 727 Bankruptcy Code.  *See* Debtor's Answer, ¶ 3 (admitted).  A copy of the Complaint is attached as **Exhibit 1** to the RJN.

---

[1]   All statutory references are to the Bankruptcy Code unless otherwise noted.

[2]   For the convenience of the Court, a copy of the Debtor's Voluntary Petition is attached to the RJN as **Exhibit 3**.

4.     This is a core proceeding pursuant 28 U.S.C. § 157(a), (b)(2)(A), (b)(2)(I), and (b)(2)(J).  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b).  *See* Debtor's Answer, ¶ 4 (admitted).

5.     Pursuant to 28 U.S.C. § 1409(a), the Plaintiff properly commences and prosecutes this adversary proceeding (the "Adversary Proceeding") in this Court, where the Defendant's Bankruptcy Case is pending.  *See* Debtor's Answer, ¶ 5 (admitted).

6.     Plaintiff Zions Bancorporation, N.A. is a national banking association, organized and existing under and by virtue of the laws of the United States of America, is qualified to do business in California and does business as California Bank & Trust.  *See* Debtor's Answer, ¶ 6 (admitted).

7.     Defendant Lynne Ai Bui is an individual, the debtor in the Bankruptcy Case, and the Defendant in this adversary proceeding.  *See* Debtor's Answer, ¶ 7 (admitted).

### III.     STATEMENT OF UNDISPUTED FACTS

### A.     The commencement of the Debtor's Bankruptcy Case and the Plaintiff's adversary proceeding against the Debtor.

8.     On July 25, 2023, the Debtor filed her bankruptcy schedules (the "Schedules") and her statement of financial affairs ("SOFA").  *See* Bk. Docket Nos. 25 and 26, copies of which are attached as **Exhibit 4 and 5** to the RJN.

9.     On November 8, 2023, this Court entered its *Order Approving Application to Appoint Chapter 11 Examiner* [Bk. Docket No. 123], and appointed Donald Kirk as examiner of the Debtor's estate (the "Examiner").

10.     On December 11, 2023, the Debtor filed the Debtor's Answer primarily denying the allegations in the Complaint on the basis that she filed her Schedules and SOFA *pro se* and would be amending them with assistance of counsel.  *See generally* Adv. Docket No. 6

11.     On January 12, 2024, the Examiner filed his Report of Examiner [Bk. Docket No. 192] (the "Examiner's Report").  A copy of the Examiner's Report is attached as **Exhibit 6** to the RJN.  The Examiner's Report detailed, over the course of 50 pages (excluding supporting

attachments), the Debtor's extensive and complex financial history involving self-settled U.S. and offshore trusts, multiple real properties, dozens of directly and indirectly owned or controlled U.S. and foreign entities, and dozens of transactions among herself, her trusts and her entities involving real properties, equity interests and cash.

12.     On January 12, 2024, the Debtor filed her amended bankruptcy schedules [Adv. Docket No. 196] (the "Amended Schedules") and amended statement of financial affairs [Bk. Docket No. 197] (the "Amended SOFA"), copies of which are attached as **Exhibits 7 and 8** to the RJN, respectively.  The Debtor's Amended Schedules and Amended SOFA addressed some, but not all, of the additional information revealed in the Examiner's Report.

13.     On February 20, 2024, this Court entered its *Order (I) Granting Chapter 11 Examiner's Motion to Compel and (II) Appointing A Chapter 11 Trustee* [Bk. Docket No. 252].

14.     On February 26, 2024, this Court appointed Maria Yip as the Chapter 11 trustee (the "Chapter 11 Trustee") of the Debtor's estate.  *See* Bk. Docket No. 258.

**B.     In September 2020, the Debtor submits her Personal Financial Statement to the Plaintiff to obtain a Home Equity Line of Credit.**

15.     On September 3, 2020, to verify that the Debtor met the Plaintiff's underwriting requirements in order to obtain a home equity line of credit from the Plaintiff, the Debtor executed a written *Personal Profile & Financial Statement* (the "Financial Statement") disclosing to the Plaintiff relevant information respecting the Debtor's background information, sources of income, assets, and liabilities.  *See* Snell Decl., ¶ 8, Exh. 1.

16.     In order to have relevant and reliable information for the Plaintiff to underwrite the loan, the Financial Statement provides that "[i]n submitting this financial statement, I guarantee its accuracy with the intent that it be relied upon by the bank in extending credit."  The Financial Statement further provides that "I warrant that I have no known obligations, direct or contingent, which have not been included herein and that I have not knowingly withheld any material information of an adverse nature."  Snell Decl., ¶ 9, Exh. 1 at p. 5.

17.     Finally, to ensure that the Plaintiff will have up-to-date relevant financial information about the borrower's financial condition in connection with the loan application process and the ultimate funding of the loan, the Financial Statement includes a statement that "I agree to notify the bank immediately, in writing, of any unfavorable change in my financial condition." Snell Decl., ¶ 10, Exh. 1 at p. 5.

18.     The Debtor then printed her name, signed and dated the Financial Statement. Snell Decl., ¶ 11, Exh. 1 at p. 5.

19.     In the Financial Statement, the Debtor represented that she had one trust, the Lynne A. Bui Living Trust, a revocable living trust (the "Bui Revocable Trust"). Snell Decl., ¶ 12, Exh.. 1 at p. 1. The Financial Statement stated that she had personal property assets totaling $517,000, consisting of (i) $17,000 in a Wells Fargo checking account, (ii) $300,000 in a Wells Fargo money market account, and (iii) $200,000 for automobile and personal assets. Snell Decl., ¶ 13, Exh. 1 at p. 2.

20.     The Debtor disclosed in the Financial Statement that she was the sole owner of "personal real estate" valued at $8,800,000 comprised of:

a.     a single-family residence located at 20565 Debbie Lane, Saratoga, California (the "Saratoga Property"), purchased in August 2003, titled in the name of the Bui Revocable Trust and valued at $3,500,000;

b.     a condo located at 1221 Parker Place, San Diego, California (the "San Diego Property"), purchased in July 2017, titled in the name of the Bui Revocable Trust and valued at $1,000,000;

c.     a single-family residence located at 4280 Knollview Drive, Danville, California (the "Danville Property"), purchased in January 2005, titled in the name of the Bui Revocable Trust, valued at $1,300,000 and subject to a mortgage in favor of Citibank for $480,000; and

d.     a single-family residence located at 1829 Bancroft Way, Berkeley, California (the "Bancroft Berkeley Property"), purchased in June 2020 and valued at $1,500,000.

Snell Decl., ¶ 14, Exh. 1 at pp. 3-4.

BUCHALTER 106627887v4

21.     The Debtor's Financial Statement disclosed *one* liability in the amount of $480,000, which she attributed to the Danville Property. This was the *only liability disclosed* in the Financial Statement by the Debtor to the Plaintiff. Snell Decl., ¶ 15, Exh. 1 at pp. 3-4.

22.     The Debtor also disclosed in her Financial Statement an annual salary of $450,000. Snell Decl., ¶ 16, Exh. 1 at p. 2.

**C.     After the submission of the Financial Statement and loan application, the Debtor obtains a $2.61 million home equity line of credit.**

23.     On or about June 1, 2021, the Debtor submitted an written loan application to the Plaintiff to obtain a Home Equity Line of Credit to be secured by the Saratoga Property (the "Loan Application"). *See* Debtor's Answer, ¶ 18 (admitted); *see also* Snell Decl., ¶ 17 Exh. 2.

24.     As part of the Loan Application, the Debtor requested a home equity loan in the amount of $3,000,000. Snell Decl., ¶ 18, Exh. 2. The Debtor also disclosed as part of the loan application process that she had lived at the Saratoga Property for two years. Snell Decl., ¶ 19.

25.     In connection with her Loan Application, the Debtor disclosed that she had annual income of $450,000 on her Financial Statement. However, that income was only attributed to her salary from her solely-owned medical practice, Global Cancer Research Institute, Inc. ("GCRI"). Snell Decl., ¶ 20. To obtain a higher credit limit, the Debtor also submitted personal tax returns for the tax years 2018 and 2019, corporate tax returns for GCRI for tax years 2018 and 2019, and her W-2's from GCRI for 2020 because she had applied for a late filing extension for her 2020 personal tax return (collectively, the "Supplemental Information"). Snell Decl., ¶ 21.

26.     Ultimately, the Debtor maintained that her "total gross monthly income" was $112,624.09 and that she had only "total monthly debt" of $26,495.76. Snell Decl., ¶ 22, Exhs. 2 and 3.

27.     Based on this Supplemental Information provided by the Debtor, the Plaintiff calculated that with $112,624.09 in total monthly income, $26,495.76 in existing monthly debt payments, plus an additional $15,136.95 for the new monthly payment under the proposed loan, the Debtor's debt to income ratio would be 36.97. Snell Decl., ¶ 23, Exh. 3.

28.     Based on the information provided in the Debtor's Financial Statement and the Supplemental Information, the Plaintiff approved the Debtor's Loan Application; Snell Decl., ¶ 24.

**D.     Following the approval of the Loan Application, the Debtor obtains a $2.61 million home equity line of credit from the Plaintiff.**

29.     On August 9, 2021, to further induce the Plaintiff into entering into the HELOC Loan transaction, the Debtor executed that certain *Borrower's Certification and Agreement Concerning Adverse Material Change to Financial Circumstances* (the "Debtor's Certification"). *See* Snell Decl., ¶ 25, Exh. 4.  The Debtor's Certification provides in relevant part:

> By my signature below, I certify to [the Plaintiff] that as of the date of this Certification, I am not aware of any Adverse Material Change to my financial circumstances, including but not limited to income, source(s) of income, assets, employment status, liabilities, or credit history, that I disclosed to [the Plaintiff] in my application for the Loan identified above.
>
> For purposes of this Certification, "Adverse Material Change" to my financial circumstances means any event, condition, or modification of such significance that it adversely affects or could reasonably be expected to adversely affect my financial capacity to repay this Loan according to its terms.

Snell Decl., ¶ 25, Exh. 4 at p. 1.

30.     The Debtor's Certification ensures that the Plaintiff has obtained from the borrower all up-to-date relevant financial information about the borrower's financial condition in connection with the loan application and underwriting process and the ultimate approval and funding of the loan.  Snell Decl., ¶ 26.

31.     On August 9, 2021, the Plaintiff and the Debtor entered into a written *Equity Credit Line Loan Agreement and Disclosure Statement* (the "Loan Agreement") whereby the Plaintiff agreed to make advances to the Debtor in a maximum principal amount of $2,610,000 (the "HELOC Loan").  *See* Debtor's Answer, ¶ 25 (admitted).  The Debtor's liability to the Plaintiff, as alleged in the Complaint, is a debt for money owed and services provided within the meaning of section 523(a)(2)(B) of the Bankruptcy Code.  *See* Debtor's Answer, ¶ 84 (admitted).

32.     In consideration for these advances, the Debtor promised to make 120 initial, interest-only payments followed by 240 amortizing payments to the Plaintiff to repay the credit

7

advances and finance charges, plus all costs and fees as authorized by the Loan Agreement. Snell Decl., ¶ 28, Exh. 5 at pp. 1 and 3.

33.     The Loan Agreement further provided that "You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein:  a Deed of Trust dated August 9, 2021, to a trustee in favor of us on real property located in Santa Clara County, State of California."  Snell Decl., Exh. 5 at p. 2.

34.     The Loan Agreement also acknowledged that the Deed of Trust contained a due on sale provision allowing the Plaintiff, "at [its] option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without our prior written consent, of all or any part of the Real Property, or any interest in the Real Property."  Snell Decl., Exh. 5 at p. 2.

35.     The Loan Agreement further included as events of default (i) if the Debtor "commit[s] fraud or make[s] a material misrepresentation at any time in connection with this Credit Agreement" including "a false statement about your income, assets, liabilities, or any other aspects of your financial condition," (ii) if the Debtor's "action or inaction adversely affects the collateral for the plan or [the Plaintiff's] rights in the collateral," (iii) the "transfer of title or sale of the dwelling," or (iv) the "creation of a senior lien on the dwelling without our permission [or] foreclosure by the holder of another lien . . . ."  Snell Decl., Exh. 5 at pp. 4-5.

36.     The Debtor further represented and warranted under the Loan Agreement that: "[n]one of your property or assets, including the Property, is subject to any security interest, mortgage, pledge, lien or other encumbrance or exception to the title of any character as of the date hereof, except as previously disclosed by you and approved by us".  Snell Decl.,  Exh. 5 at p. 4.

37.     To secure the Debtor's payment and performance of her obligations to the Plaintiff under the Loan Agreement, the Debtor executed a *Deed of Trust (Variable Interest Rate Revolving Line of Credit)* dated August 9, 2021 (the "Zions Deed of Trust", collectively with the Loan Agreement and all other documents and instruments evidencing and securing the Debtor's

obligations to the Plaintiff, the "Loan Documents") for the benefit of the Plaintiff.  *See* Debtor's Answer, ¶ 33 (admitted); *see also* Snell Decl., ¶ 29 and Exh. 6.

38.     The Zions Deed of Trust granted the Plaintiff a security interest in the Debtor's Saratoga Property and included an assignment of rents.  Snell Decl., ¶ 30.

39.     The Zions Deed of Trust further included as events of default (i) if the Debtor "commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement" including "a false statement about Borrower's or Trustor's income, assets, liabilities, or any other aspects of Borrower's or Trustor's financial condition," (ii) if the Debtor's "action or inaction adversely affects the collateral or [the Plaintiff's] rights in the collateral," (iii) the "transfer of title or sale of the dwelling," or (iv) the "creation of a senior lien on the dwelling without Lender's permission [or] foreclosure by the holder of another lien . . . ."  Snell Decl., Exh.6 at p. 3.

40.     In reliance on the representations made by the Debtor in the Loan Agreement, the Loan Application, the Financial Statement, the Supplemental Information and in all other relevant documents and information provided by the Debtor, the Plaintiff agreed to advance financing to the Debtor on the terms and conditions set forth in the Loan Agreement.  Snell Decl., ¶ 31.

41.     Pursuant to the Loan Documents, the Plaintiff advanced (i) $1,590,000.00 to the Debtor on August 17, 2021, and (ii) $1,019,995.50 to the Debtor on September 2, 2021.  *See* Debtor's Answer, ¶ 26 (admitted); *see also* Snell Decl., ¶ 32.

**E.     The Debtor fraudulently induced the Plaintiff to extend the HELOC Loan based on multiple omissions and misrepresentations during the application process.**

*1.     The Debtor fails to disclose over $11 million in personal liabilities and other relevant financial information her Financial Statement.*

42.     The Debtor in her Financial Statement only disclosed her interests in (i) the Bui Revocable Trust, (ii) personal property assets totaling $517,000, consisting of a Wells Fargo checking account, a Wells Fargo money market account, automobiles and other personal assets, (iii) three real properties owned by the Bui Revocable Trust, consisting of the Saratoga Property, the Danville Property, and the San Diego Property, and (iv) one real property held in her own name

9

(*i.e.,* the Bancroft Berkeley Property).  Snell Decl., Exh.. 1 at pp. 2-4.  The Debtor also disclosed in her Financial Statement a *single* liability of $480,000 related to the Danville Property and an annual salary of $450,000.  Snell Decl., Exh. 1 at pp. 1 and 3.

43.    The Debtor's disclosures in her Amended Schedules and Amended SOFA, signed under penalty of perjury, filings of other creditors and interested parties (including Proofs of Claim), and the Examiner's Report all confirm a much different picture of the Debtor's finances.

> **a.    The Undisclosed Entities at the time of the submission of the Financial Statement.**

44.    The Debtor failed to disclose the long-standing existence of a self-settled offshore trust, The Pemberley 2018 Trust, an irrevocable Cayman Island Trust (the "Pemberley Trust"), which owned or controlled multiple entities and assets.  *See Amended Schedules*, Schedule A/B, p. 11 [Bk. Docket No. 196]; *Amended SOFA*, p. 7 [Bk. Docket No. 197].  The Debtor was the Settlor of the Pemberley Trust and she and her two sons were its beneficiaries.  *See Declaration of Lynne A. Bui in support of Proof of Claim Filed by Global Cancer Research Institute, Inc.* at ¶¶ 17-19 [Proof of Claim No. 40-1] at p. 6 of 96, a copy of which is attached as **Exhibit 20** to the RJN.

45.    The Debtor also failed to disclose in her Financial Statement the following entities that she owned or controlled at the time she submitted the Financial Statement to the Plaintiff (collectively and together with the Pemberley Trust, the "PFS Undisclosed Entities"):

> a.    **Khloris Biosciences, Inc.**, a Delaware corporation ("Khloris Bio"), which the Debtor formed on June 14, 2017.  Khloris Bio is a failed biotech startup company.  *See Amended Schedules*, Schedule A/B, p. 10 [Bk. Docket No. 196]; *Amended SOFA*, p. 8 [Bk. Docket No. 197]; *see also Examiner's Report*, p. 33 [Bk. Docket No. 192];

> b.    **Zephyr Asset Management, LLC** ("Zephyr Management"), which the Debtor formed in 2018 and transferred a 98% ownership interest to her Pemberley Trust and a 2% ownership interest to her Bui Revocable Trust.  Zephyr Management owned or managed almost all of the Debtor's real properties.  *See Amended Schedules*, Schedule A/B, pp. 8-10 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 35 [Bk. Docket No. 192];

> c.    **Cambridge Properties, LLC** ("Cambridge Properties"), which the Debtor formed in March 2020 and transferred to Zephyr Management in 2022.  Cambridge

Properties owned the Los Gatos Property (as defined below). *See Amended Schedules*, Schedule A/B, p. 8 [Bk. Docket No. 196]; *Amended SOFA*, p. 8 [Bk. Docket No. 197]; *see also Examiner's Report*, pp. 28-29 [Bk. Docket No. 192]; and

       d.      **LeSoleil, Inc.**, a California corporation ("LeSoleil"), which the Debtor formed on August 6, 2020 and transferred to the Pemberley Trust in 2022. The Debtor invested $4 million in LeSoleil in 2020 to make solar panels at the Fontanoso Property, which the Debtor also failed to disclose to the Plaintiff. *See Amended Schedules*, Schedule A/B, p. 10 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 34 [Bk. Docket No. 192].

       46.      Had the Debtor disclosed the foregoing entities in which she held a direct or indirect ownership interest, the Plaintiff would have investigated these entities and asked for additional information respecting their ownership structure, assets, liabilities, income, expenses, and any potential impact that the foregoing would have on the Debtor's financial condition as part of the underwriting of the HELOC Loan. Snell Decl., ¶ 33; *see also* Tanner Decl., ¶ 4.

       **b.      The Undisclosed Properties at the time of the submission of the Financial Statement.**

       47.      The Debtor also failed to disclose in the Financial Statement the following real properties that she either owned or controlled at the time she submitted the Financial Statement to the Plaintiff (collectively, the "PFS Undisclosed Properties"):

       a.      **3600 Wailea Alanui Dr., #2102, Kihei, Hawaii:** a condominium owned by the Bui Revocable Trust (the "Kihei Property"). *See Amended Schedules*, Schedule A/B, p. 3 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 21 [Bk. Docket No. 192];

       b.      **757 Ocean Ave. #309, Santa Monica, California:** a condominium owned by the Bui Revocable Trust (the "Santa Monica Property"). *See Amended Schedules*, Schedule A/B, p. 4 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 21 [Bk. Docket No. 192]; and

       c.      **14911 National Ave., Los Gatos, California:** a commercial property owned by Cambridge Properties (the "Los Gatos Property"). *See Amended Schedules*, Schedule A/B, p. 8 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 28-29 [Bk. Docket No. 192].

       48.      Had the Debtor disclosed the foregoing real properties in which she either directly owned or controlled, the Plaintiff would have investigated these properties and asked for additional information respecting their ownership, value, encumbrances, and any potential impact that the foregoing would have on the Debtor's financial condition as part of the underwriting of the HELOC Loan. Snell Decl., ¶ 34; *see also* Tanner Decl., ¶ 5.

BUCHALTER 106627887v4

c. **The Undisclosed Liabilities at the time of the submission of the Financial Statement.**

49. At the time the Debtor submitted the Financial Statement to the Plaintiff, the Debtor failed to disclose that she was personally responsible for the payment of over $11.3 million in liabilities either directly or through guarantees (collectively, the "PFS Undisclosed Liabilities"):

a. **Cathay Bank Debt:** the Debtor's March 5, 2020 personal guaranty of $4.030 million of debt owed by Cambridge Properties to Cathay Bank pursuant to that certain *Commercial Guaranty*. *See* Proof of Claim No. 18-1, a copy of which is attached as **Exhibit 12** to the RJN, *Amended Schedules*, Schedule D, p. 4 of 17 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 28 [Bk. Docket No. 192]; and

b. **Guaranteed Rate Affinity Debt:** the Debtor's June 26, 2020 loan obligation originally owed to Guaranteed Rate Affinity, LLC in the principal amount of $497,000 pursuant to that certain *Note*. *See* Proof of Claim 17-1, a copy of which is attached as **Exhibit 11** to the RJN.

c. **Pentagon Federal Credit Union Debt:** the Debtor's June 30, 2020 loan obligation originally owed to Guaranteed Rate Affinity, LLC (now Pentagon Federal Credit Union) in the principal amount of $1.2 million pursuant to that certain *Note*. *See* Proof of Claim 31-2, a copy of which is attached as **Exhibit 19** to the RJN; *see also Amended Schedules*, Schedule D, p. 9 of 17 [Bk. Docket No. 196].

d. **Global Cancer Research Debt:** the loans made by GCRI to the Debtor during the period between March 9, 2020 and October 26, 2020 in the total amount of $5,585,000. *See* Proof of Claim No. 40-1 at .pdf pp. 6-7 of 96, a copy of which is attached as **Exhibit 20** to the RJN.

50. Had the Debtor disclosed the foregoing loan or guaranty obligations in which she was liable, the Plaintiff would have investigated these obligations and asked for additional information respecting any potential impact that the foregoing would have on the Debtor's financial condition and ability to repay the HELOC Loan obligation as part of the underwriting of the HELOC Loan. Snell Decl., ¶ 35; *see also* Tanner Decl., ¶ 6.

51. The Debtor failed to disclose to the Plaintiff the existence of the Pemberley Trust, the PFS Undisclosed Entities, the PFS Undisclosed Properties and the PFS Undisclosed Liabilities in her Financial Statement or at any time prior to the execution of the Loan Documents and the Plaintiff's funding of the HELOC Loan to the Debtor. Snell Decl., ¶ 36; *see also* Tanner Decl., ¶ 7. The failure to disclose the Pemberley Trust, the PFS Undisclosed Entities, the PFS

12

Undisclosed Properties and the PFS Undisclosed Liabilities materially impacted the Plaintiff's ability to underwrite the loan to the Debtor.  Snell Decl., ¶ 37; *see also* Tanner Decl., ¶ 8.

> 2.    *Prior to the execution of the Debtor's Certificate, the Debtor failed to disclose additional material information respecting her finances.*

52.    Between the time the Debtor submitted the Financial Statement and the time that the Debtor submitted the Debtor's Certification, executed the Loan Documents and obtained $2.61 million from the Plaintiff, the Debtor acquired ownership or control over three *additional* entities, two *additional* real properties and personally assumed five *additional* personal, debt obligations loans totaling $16.325 million as discussed below.

> a.    **The Undisclosed Entities at the time of the submission of the Debtor's Certificate.**

53.    The Debtor failed to disclose the following *additional* entities that she came to own or control between at the time she executed the Loan Documents and obtained the HELOC Loan from the Plaintiff (collectively, the "Pre-Funding Undisclosed Entities"):

> a.    **Gladdington Properties, LLC** ("Gladdington Properties"), which the Debtor formed in April 2021 and transferred to Zephyr Management in 2022. Gladdington Properties owned the Milpitas Property (as defined below).  *See Amended Schedules*, Schedule A/B, p. 8 [Bk. Docket No. 196]; *Amended SOFA*, p. 8 [Bk. Docket No. 197]; *see also Examiner's Report*, pp. 30-31 [Bk. Docket No. 192];

> b.    **Elessar Properties, LLC**, a California limited liability company ("Elessar Properties"), which the Debtor formed on September 14, 2020 and transferred to Zephyr Management in 2022.  Elessar Properties owned the Gilroy Property (as defined below). *See Amended Schedules*, Schedule A/B, p. 9 [Bk. Docket No. 196]; *Amended SOFA*, p. 8 [Bk. Docket No. 197]; *see also Examiner's Report*, pp. 30-31 [Bk. Docket No. 192];

> c.    **Atlas Capital Investments, LLC** ("Atlas Capital"), which the Debtor formed on September 14, 2020 and transferred to Zephyr Management in 2022.  Atlas Capital owned the Fontanoso Property (as defined below).  *See Amended Schedules*, Schedule A/B, p. 9 [Bk. Docket No. 196]; Affidavit of Ross Tesser, attached as Ex C to Tesser, LLC's *Motion for Relief from Automatic Stay* (the "Tesser Affidavit") [Bk. Docket No. 209-3 at ¶ 4], a copy of which is attached as **Exhibit 9** to the RJN; *see also Examiner's Report*, p. 26 [Bk. Docket No. 192]; and

> d.    **Vintage Point Properties, LLC** ("Vintage Point"), which the Debtor formed on September 14, 2020 and subsequently transferred to Zephyr Management in 2022.  Vintage Point owned the Milvia Berkeley Property (as defined below).  *See*

*Amended Schedules*, Schedule A/B, p. 9 of 17 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 34-35 [Bk. Docket No. 192].

54.     Had the Debtor disclosed the foregoing entities in which she held a direct or indirect ownership interest, the Plaintiff would have investigated these entities and asked for additional information respecting their ownership structure, assets, liabilities, income, expenses, and any potential impact that the foregoing would have on the Debtor's financial condition as part of the underwriting of the HELOC Loan.  Snell Decl., ¶ 38; *see also* Tanner Decl., ¶ 9.

> **b.     The Undisclosed Properties at the time of the submission of the Debtor's Certificate.**

55.     The Debtor failed to disclose the following *additional* real properties that she came to own or control between the time she executed the Loan Documents and obtained the HELOC Loan from the Plaintiff (collectively, the "Pre-Funding Undisclosed Properties"):

> a.     **9460 No Name Uno, Gilroy, California:**  commercial property owned by Elessar Properties (the "Gilroy Property").  *See Amended Schedules*, Schedule A/B, p. 9 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 30, 44 [Bk. Docket No. 192];

> b.     **1498 Gladding Ct., Milpitas, California:** a commercial property owned by Gladdington Properties (the "Milpitas Property").  *See Amended Schedules*, Schedule A/B, p. 8 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 32, 44 [Bk. Docket No. 192]; and

> c.     **1729 Milvia Street, Berkeley, California 94706:**  residential property owned by Vintage Point Properties, LLC (the "Milvia Berkeley Property").  *See Amended Schedules*, Schedule A/B, p. 9 of 17 [Bk. Docket No. 196].

56.     Had the Debtor disclosed the foregoing real properties in which she either directly owned or controlled, the Plaintiff would have investigated these properties and asked for additional information respecting their ownership, value, encumbrances, and any potential impact that the foregoing would have on the Debtor's financial condition as part of the underwriting of the HELOC Loan.  Snell Decl., ¶ 39; *see also* Tanner Decl., ¶ 10.

> **c.     The Undisclosed Liabilities at the time of the submission of the Debtor's Certificate.**

57.     Between the time the Debtor submitted her Financial Statement to the Plaintiff (*i.e.*, September 3, 2020) and the time she executed the Debtor's Certification and the Loan Documents

thereby obtaining the HELOC Loan from the Plaintiff (*i.e.*, August 9, 2021), the Debtor failed to disclose that she had personally assumed responsibility for the payment of $16.325 million in *additional* liabilities owed with respect to the Pre-Funding Undisclosed Entities and Pre-Funding Undisclosed Properties (collectively, the "Pre-Funding Undisclosed Liabilities"):

      a.    **Santa Cruz County Bank Debt:** the Debtor's December 3, 2020 $6.965 million personal guaranty of Elessar Properties' debt to Santa Cruz County Bank for the financing of the Gilroy Property. *See Amended Schedules*, Schedule D, p. 11 of 17 [Bk. Docket No. 196]; and

      b.    **CTBC Bank Debt:** the Debtor's March 15, 2021 personal guaranty of $2.6 million of debt owed by Gladdington Properties to CTBC Bank for the financing of the Milpitas Property. *See* Proof of Claim No. 29-1, a copy of which is attached as **Exhibit 17** to the RJN; *see also Amended Schedules*, Schedule D, p. 6 of 17 [Bk. Docket No. 196];

      c.    **Santa Cruz County Bank Debt:** the Debtor's May 17, 2021 loan obligation owed to Santa Cruz County Bank in the principal amount of $1,000,000 pursuant to that certain *Promissory Note*. *See* Proof of Claim 6-1, a copy of which is attached as **Exhibit 10** to the RJN;

      d.    **United Business Bank Debt:** the Debtor's July 29, 2021 loan obligation owed to United Business Bank in the principal amount of $5,000,000 pursuant to that certain *Business Loan Agreement* and *Promissory Note*. *See* Proof of Claim 19-2, a copy of which is attached as **Exhibit 13** to the RJN; and

      e.    **Redwood Mortgage Debt:** the Debtor's July 29, 2021 personal guaranty obligation in the amount of $760,000 for Gladdington Properties' second lien mortgage debt to Redwood Mortgage for the financing the Milpitas Property. *See Amended Schedules*, Schedule D, p. 9 of 17 [Bk. Docket No. 196].

58.    Clearly, the Debtor intentionally disregarded her obligation in her Financial Statement to "notify the bank immediately, in writing, of any unfavorable change in my financial condition" or her obligation under the Debtor's Certificate to advise the Plaintiff of "any Adverse Material Change to [her] financial circumstances, including but not limited to income, source(s) of income, assets, employment status, liabilities, or credit history . . . ." Snell Decl., ¶ 40, Exhs. 1 and 4. As such, the Debtor failed to disclose these Pre-Funding Undisclosed Liabilities to the Plaintiff as required under the Financial Statement or the Debtor's Certificate. Snell Decl., ¶ 40.

59.    Had the Debtor disclosed the Pre-Funding Undisclosed Liabilities as required by the Financial Statement and the Debtor's Certificate, the Plaintiff would have investigated these

obligations and asked for additional information respecting any potential impact that the foregoing would have on the Debtor's financial condition and ability to repay the HELOC Loan obligation as part of the underwriting of the HELOC Loan. Snell Decl., ¶ 41; *see also* Tanner Decl., ¶ 11.

60.     In reliance on the representations made by the Debtor in the Financial Statement, the Loan Application, the Supplemental Information, the Loan Agreement, and in all other relevant documents and information provided by the Debtor, the Plaintiff agreed to advance financing to the Debtor on the terms and conditions set forth in the Loan Agreement. Snell Decl., ¶ 42.

61.     Had the Plaintiff been aware of the true extent of the Debtor's financial condition and extensive, undisclosed liabilities, the Plaintiff would not have extended the HELOC Loan to the Debtor. Snell Decl., ¶ 43; *see also* Tanner Decl., ¶ 12.

**F.     The Debtor transfers the Saratoga Property in violation of the Loan Documents and to the ultimate detriment of the Plaintiff.**

*1.     The Debtor transfers the Saratoga Property from the Bui Revocable Trust to her consulting company and then to herself.*

62.     On or about May 6, 2022, after the Plaintiff fully funded the HELOC Loan, the Debtor, as trustee of the Bui Revocable Trust, transferred the Saratoga Property to LBS Associates LLC ("LBS Associates") by grant deed (the "LBS Saratoga Deed"). Snell Decl., ¶ 44. LBS Associates recorded the LBS Saratoga Deed on May 16, 2022. *See* Snell Decl., ¶ 44, Exh. 7; *see also Examiner's Report*, pp. 33-34 [Bk. Docket No. 192].

63.     LBS Associates is a "consulting firm" solely owned by the Debtor, founded in 2011 and was not disclosed in the Debtor's Financial Statement. Snell Decl., ¶ 45, Exhs. 1 and 7; *see also Examiner's Report*, pp. 33-34 [Bk. Docket No. 192].

64.     Subsequently, on October 13, 2022, after transferring the Saratoga Property to LBS Associates, the Debtor caused LBS Associates to transfer its interest in the Saratoga Property to the Debtor, personally (the "the Saratoga Deed"). On November 3, 2022, the Debtor recorded the Saratoga Deed. Snell Decl., ¶ 46, Exh. 8.

65.     The Debtor's transfers of the Saratoga Property (*i.e.*, the Plaintiff's collateral) shortly after the Plaintiff loaned $2.61 million to the Debtor were done without the Plaintiff's knowledge or consent, in violation of the Loan Documents.  Snell Decl., ¶ 47.  The Plaintiff would not have extended the HELOC Loan to the Debtor if it had known that the Plaintiff would transfer its collateral in furtherance of her fraudulent schemes.  Snell Decl., ¶ 48.

2.     *Following the transfers, the Debtor obtains a second loan to be "secured" by the Saratoga Property from Kelly Mortgage, Inc.*

66.     On November 23, 2022 – only weeks after transferring the Saratoga Property to herself – the Debtor personally executed and delivered to Kelly Mortgage, Inc. ("Kelly Mortgage"), as lender, a written Note ("KMI Note") whereby Kelly Mortgage agreed to lend $3,000,000 to the Debtor (the "KMI Loan").  *See* Debtor's Answer, ¶ 45 (admitted)*; see also* Snell Decl., ¶ 49, Exh. 9.  In return for the KMI Loan, the Debtor agreed to pay $3,000,000, plus interest, to the order of Kelly Mortgage.  Snell Decl., ¶ 49, Exh. 9.

67.     The obligations evidenced by the KMI Note are secured by a Deed of Trust dated November 23, 2022 (the "KMI Deed of Trust"), which was executed by the Debtor for the benefit of Kelly Mortgage.  Snell Decl. ¶ 50.  The KMI Deed of Trust was recorded on December 2, 2022 against the Saratoga Property in the Santa Clara County Recorder's Office bearing Instrument No. 25410735.  Snell Decl., ¶ 50, Exh. 10.

68.     On April 26, 2023, Mortgage Electronic Registration Systems, Inc., as nominee for Kelly Mortgage, assigned (the "KMI Assignment") to Shellpoint Mortgage Services/Goldman Sachs Mortgage Company ("Goldman") all its rights, title and interest in and to the 2022 Trust Deed.  Snell Decl., ¶ 51.  On May 5, 2023, Goldman recorded the Assignment in the Santa Clara County Recorder's Office bearing Instrument No. 25469113.  Snell Decl., ¶ 51, Exh. 11; *see also Amended Schedules*, Schedule D, p. 16 of 17 [Bk. Docket No. 196].

69.     The Debtor's loan from Kelly Mortgage and the corresponding grant of the KMI Deed of Trust to secure an additional $3 million of personal indebtedness with a junior lien on the Saratoga Property (and subsequent KMI Assignment to Goldman) was done without the Plaintiff's

knowledge or consent, in violation of the Loan Documents, and in bad faith.  Snell Decl., ¶ 52. The Plaintiff would not have extended the HELOC Loan to the Debtor if it had known that the Debtor would shortly thereafter borrow an *additional $3 million*, much less secured by the Plaintiff's own collateral.  Snell Decl., ¶ 53.

### G.    The Debtor's fraudulent scheme continued after the funding of the HELOC Loan through the commencement of the Debtor's Bankruptcy Case.

70.    In the two year period following the funding of the HELOC Loan and prior to the Petition Date, the Debtor continued her fraudulent scheme to incur more debt and move her assets offshore and out of the reach of her creditors, including the Plaintiff.  After the funding of the HELOC Loan and during this "Pre-Bankruptcy Period," the Debtor acquired ownership or control over six additional entities, seven additional real properties and personally assumed seven loans totaling $25 million in *additional*, personal obligations.

> *1.    The Examiner uncovers a web of new entities and properties as part of the Debtor's fraudulent scheme.*

71.    The Examiner appointed in the Debtor's Bankruptcy Case had identified six additional entities that were formed in 2021 (either prior to or after the funding of the HELOC Loan) that had not been disclosed to the Plaintiff (collectively, the "Pre-Bankruptcy Undisclosed Entities"):

     a.    **Dragonhorse Group Pty, Ltd.**, an Australian entity ("Dragonhorse"), which the Debtor formed and owned in her own name.  Dragonhorse owned the Brisbane Property (as defined below).  *See Amended Schedules*, p. 10 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 15 [Bk. Docket No. 192];

     b.    **ACN Group, Ltd.** ("ACN"), which the Debtor formed in 2021 and transferred to the Pemberley Trust in 2022.  ACN owned Heritage House GCI and Boggy Sands GCI (as defined below).  *See Amended Schedules*, p. 9 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 24-25 [Bk. Docket No. 192];

     c.    **Bright Mountain Group, Inc.** ("BMG"), which the Debtor formed in 2021 and transferred to Dorchester (as defined below).  BMG owned Seabreeze Villas GCI and Pelican Point GCI (as defined below).  *See Amended Schedules*, p. 9 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 27-28 [Bk. Docket No. 192];

18

d.      **Beach Bay Group, Ltd.** ("Beach Bay"), which the Debtor formed in 2021 and transferred to the Pemberley Trust in 2021.  Beach Bay owned Beach Bay GCI (as defined below).  *See Amended Schedules*, p. 9 [Bk. Docket No. 196]; see *also Examiner's Report*, pp. 21, 39 [Bk. Docket No. 192];

e.      **AIA Group, Ltd.** ("AIA Group"), which the Debtor formed in 2021 and transferred to the Pemberley Trust.  AIA Group owned Old Man Bay GCI (as defined below).  *See Amended Schedules*, p. 9 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 25 [Bk. Docket No. 192]; and

f.      **The Dorchester Group, Inc.** ("Dorchester"), which the Debtor formed in 2021 and transferred to the Pemberley Trust. Dorchester owned BMG.  *See Amended Schedules*, p. 10 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 29-33, 39 [Bk. Docket No. 192].

72.     The Examiner also identified seven additional properties that the Debtor came to own or control during the two-year period following the funding of the HELOC Loan and the Petition Date, which the Debtor failed to disclose to the Plaintiff (collectively, the "Pre-Bankruptcy Undisclosed Properties"):

a.      **2062 Rum Point Dr., Grand Cayman Islands:** owned by ACN ("Heritage House GCI").  *See Amended Schedules*, p. 9 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 24-25, 43 [Bk. Docket No. 192];

b.      **Coconut 1, Grand Cayman Islands:**  owned by ACN ("Boggy Sands GCI").  *See Amended Schedules*, p. 9 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 24-25, 43 [Bk. Docket No. 192];

c.      **Seabreeze Villas, Unit 4, Grand Cayman Islands:** owned by BMG ("Seabreeze Villas GCI").  *See Amended Schedules*, p. 9 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 27 [Bk. Docket No. 192];

d.      **1206 Rum Point Dr., Grand Cayman Islands:** owned by BMG ("Pelican Point GCI").  *See Amended Schedules*, p. 9 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 27-28 [Bk. Docket No. 192];

e.      **Beach Bay Land, Grand Cayman Islands:** owned by Beach Bay ("Beach Bay GCI").  *See Amended Schedules*, p. 10 [Bk. Docket No. 196]; *see also Examiner's Report*, pp. 24, 27, 39, 43 [Bk. Docket No. 192];

f.      **Old Man Bay Land, Grand Cayman Islands:** owned by AIA ("Old Man Bay GCI").  *See Amended Schedules*, p. 10 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 25 [Bk. Docket No. 192]; and

g.      **4803/8 Adelaide St., Brisbane City, Australia:**  owned by Dragonhorse (the "Brisbane Property").  *See Amended Schedules*, p. 10 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 15 [Bk. Docket No. 192].

19

73.     The disclosure of foreign trusts, foreign entities, and foreign properties would have been a material consideration for the Plaintiff in determining whether to extend credit to the Debtor or even to allow the Debtor to transact business with the Plaintiff through her deposit accounts. Snell Decl., ¶ 54.  Various regulations applicable to the Plaintiff, including, among others, the "Know Your Customer" regulatory requirements, call for reporting on borrowers with foreign holdings or transactions.  Snell Decl., ¶ 55.

> 2.     *The Debtor incurs over $25 million in loan or guaranty obligations following the funding of the HELOC Loan in connection with the Debtor's fraudulent scheme.*

74.     In the two year period following the funding of the HELOC Loan and prior to the Petition Date, the Debtor continued her fraudulent scheme by incurring over $25 million in *additional* liabilities owed with respect to the Pre-Bankruptcy Undisclosed Entities and Pre-Bankruptcy Undisclosed Properties (collectively, the "Pre-Bankruptcy Undisclosed Liabilities"):

a.     **The Evergreen Advantage Debt:**  The Debtor's May 27, 2022 personal guaranty of $18.395 million of debt owed by Atlas Capital to The Evergreen Advantage, LLC for the financing of the Fontanoso Property pursuant to that certain *Continuing and Unconditional Personal Guaranty.  See* Proof of Claim No. 23-1, a copy of which is attached as **Exhibit 14** to the RJN; *see also Amended Schedules*, Schedule D, p. 7 of 17 [Bk. Docket No. 196];

b.     **The Evergreen Advantage Debt:**  The Debtor's May 27, 2022 personal guaranty of $1.737 million of debt owed by Cambridge Properties to The Evergreen Advantage, LLC pursuant to that certain *Continuing and Unconditional Personal Guaranty.  See* Proof of Claim No. 24-1, a copy of which is attached as **Exhibit 15** to the RJN; *see also Amended Schedules*, Schedule D, p. 7 of 17 [Bk. Docket No. 196]; *see also Examiner's Report*, p. 28 [Bk. Docket No. 192].

c.     **The Evergreen Advantage Debt:**  The Debtor's May 27, 2022 personal guaranty of $268,000 of debt owed by Elessar Properties to The Evergreen Advantage, LLC pursuant to that certain *Continuing and Unconditional Personal Guaranty.  See* Proof of Claim No. 25-1, a copy of which is attached as **Exhibit 16** to the RJN; *see also Amended Schedules*, Schedule D, p. 8 of 17 [Bk. Docket No. 196];

d.     **Sakura Financial Debt:**  The Debtor's $300,000 personal guaranty of Gladdington Properties' debt to Sakura Financial for the financing of the Milpitas Property. *See Amended Schedules*, Schedule D, p. 10 of 17 [Bk. Docket No. 196];

e.      **Sakura Financial Debt:**  The Debtor's $1.6 million personal guaranty of Elessar Properties' debt to Sakura Financial for the financing of the Gilroy Property.  *See Amended Schedules*, Schedule D, p. 10 of 17 [Bk. Docket No. 196];

f.      **Scott Capital Management Debt:**  The Debtor's $460,000 personal guaranty of Vintage Point's debt to Scott Capital Mgmt., Inc. for the financing of the Milvia Berkeley Property.  *See Amended Schedules*, Schedule D, p. 11 of 17 [Bk. Docket No. 196];

g.      **Tesser LLC Debt:**  The Debtor's $900,000 personal guaranty of Atlas Capital's debt to Tesser, LLC for the financing of the Fontanoso Property.  *See Amended Schedules*, Schedule D, p. 13 of 17 [Bk. Docket No. 196];

h.      **Coe Group Debt:**  The Debtor's $1 million personal guaranty of AIA's debt to Coe Group, Ltd. For the financing of Heritage House GCI and Boggy Sands GCI. *See Amended Schedules*, Schedule D, p. 5 of 17 [Bk. Docket No. 196]; and

i.      **Coe Group Debt:**  The Debtor's $400,000 personal guaranty of BMG's first lien mortgage debt to Coe Group, Ltd. for the financing of Seabreeze Villas GCI.  *See Amended Schedules*, Schedule D, p. 6 of 17 [Bk. Docket No. 196].

**H.      Multiple events of default have occurred under the Loan Documents.**

75.      The Debtor has breached the Loan Documents in numerous ways.  First, the Debtor agreed to make timely payments under Loan Agreement.  Snell Decl., ¶ 56, Exh. 5.  The Debtor failed to make her monthly debt service payments from and after May 2023.  Snell Decl., ¶ 56.

76.      Second, the Debtor transferred the Saratoga Property from the Bui Revocable Trust to LBS Associates and then to herself within a year after obtaining the HELOC Loan.  The Debtor then allowed the KMI Deed of Trust to recorded as a lien on the Saratoga Property in violation of the Loan Documents.  Snell Decl., ¶ 57.  Specifically, the Loan Agreement and Zions Deed of Trust required the Debtor to obtain prior written approval before any transfer of the underlying real property or the allowance of any liens to be placed on the collateral property.  Snell Decl., Exh. 5 at pp. 2 and 4 and Exh. 6 at p. 2.

77.      The Zions Deed of Trust further included a due on sale clause, allowing the Plaintiff, "at [its] option, declare immediately due and payable all sums secured by the Zions Deed of Trust upon the sale or transfer, without our prior written consent, of all or any part of the Real Property, or any interest in the Real Property."  Snell Decl., Exh. 6 at p. 2.

78.    The Debtor's transfers of the Saratoga Property to LBS Associates and then to herself within a year after the HELOC Loan was entered into and funded, followed weeks later by the KMI Loan and KMI Deed of Trust were clear breaches of the Zions Deed of Trust and clear evidence of the Debtor's bad faith intent in obtaining the HELOC Loan.  Snell Decl., ¶ 58.

79.    Third, the Loan Agreement included the following events of default:  (i) if the Debtor "commit[s] fraud or make[s] a material misrepresentation at any time in connection with this Credit Agreement" including "a false statement about your income, assets, liabilities, or any other aspects of your financial condition"; (ii) if the Debtor's "action or inaction adversely affects the collateral for the plan or [the Plaintiff's] rights in the collateral"; (iii) the "transfer of title or sale of the dwelling"; or (iv) the "creation of a senior lien on the dwelling without our permission [or] foreclosure by the holder of another lien . . . ."  Snell Decl., Exh. 5 at p. 4.

80.    These events of default were triggered, as clearly demonstrated herein, when the Debtor misrepresented and omitted material information about her finances in the Financial Statement, the Loan Application, the Supplemental Information, the Debtor's Certificate and in all other relevant documents and information provided by the Debtor in connection with (i) the Plaintiff's evaluation of the Loan Application and underwriting of the HELOC Loan, (ii) the Plaintiff's approval of the HELOC Loan, and (iii) the Debtor's express, continuing duty to inform the Plaintiff of any material changes in the Debtor's finances that would impact the Plaintiff's evaluation of the HELOC Loan and the Debtor's creditworthiness.  Snell Decl., ¶ 59.

81.    As a result of the Debtor's multiple breaches of the Loan Documents and clear bad faith in obtaining the HELOC Loan, the Plaintiff has incurred significant damages.  There is now due, owing, and payable to the Plaintiff from the Debtor under the Agreement the sum of not less than $3,452,474.62 as of November 30, 2025 as follows:

/ / /

/ / /

/ / /

/ / /

| | |
|---|---|
| Principal Balance: | $2,616,543.59 |
| Accrued Interest: | $587,041.80 |
| Legal Fees and Costs: | $243,649.23 |
| Late Fees: | $3,500.00 |
| Mortgage Lender Title Services: | $800.00 |
| Appraisal Expense: | $750.00 |
| Reconveyance Fee: | $190.00 |
| **Total Payoff:** | **$3,452,474.62 (as of 11/30/25)** |

Snell Decl., ¶ 60.

82.     This amount due will continue to accrue interest fees and costs until paid in full. Assuming the Court grants this Motion, the Plaintiff will file a supplemental declaration updating the amount due and owing for the entry of the judgment.

## IV.    LEGAL ARGUMENT

### A.    The Plaintiff has met the legal standard on summary judgment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see* FED. R. BANKR. P. 7056 (incorporating FED. R. CIV. P. 56); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986) (noting that summary judgment is " an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action")(internal citations omitted).   "An issue of fact is 'material' if it might affect the outcome of the case under the governing law[, and] it is 'genuine' if the evidence could lead a reasonable jury to find for the non-moving party." *Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1375 (S.D. Fla. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248.

The Court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).  The Court should grant the motion if the pleadings, together with supporting materials in the record, show that the movant is entitled to judgment as a matter of law.  *Greenberg v. BellSouth*

23

*Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam).  The party moving for summary judgment "always bears the initial responsibility of informing the court of the basis for its motion."  *Celotex*, 477 U.S. at 323 (citing FED. R. CIV. P. 56).

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish — with evidence beyond the pleadings — that a genuine dispute material to each of its claims for relief exists.  *Id.* at 324.  There is no genuine issue of material fact if the nonmoving party has produced no evidence such that a reasonable factfinder could return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  A mere "scintilla" of evidence supporting the respondent's position will not be sufficient.  *Anderson*, 477 U.S. at 247-48.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial."  *Hawking v. Ford Motor Credit Co.*, 210 F.3d 540, 545 (5th Cir. 2000) *citing Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The motion must be granted if the Court is satisfied that no real factual controversy is present, so that the remedy can serve its salutary purpose in avoiding a useless, expensive and time-consuming trial where there is no genuine, material issue to be tried. *Posillico v. Bratcher (In re Bratcher)*, 281 B.R. 753, 759 (Bankr. M.D. Fla. 2002) (internal citations omitted).

Here, as explained below, the Plaintiff is entitled to summary judgment on three independent grounds.  *See Grogan v. Garner*, 498 U.S. 279, 288-91 (1991) (preponderance of the evidence standard applies to all section 523(a) dischargeability proceedings, including fraud).

**B.    The Debtor's use of a materially false Loan Documents renders her debt to the Plaintiff not dischargeable under section 523(a)(2)(B).**

The Debtor's failure to accurately report her true financial condition—by hiding millions of dollars in personal liabilities and an extensive array of domestic and foreign entities and properties—renders her debt to the Plaintiff not dischargeable.  Section 523(a)(2)(B) provides that a discharge under section 727 or 1141 does not discharge an individual debtor from any debt:

(2)     for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

     (B)     use of a statement in writing—

          (i)     that is materially false;

          (ii)     respecting the debtor's or an insider's financial condition;

          (iii)     on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

          (iv)     that the debtor caused to be made or published with intent to deceive . . . .

11 U.S.C. § 523(a)(2)(B).

As discussed in detail in the Statement of Undisputed Facts above, the facts of this case clearly meet the elements of nondischargeability under Section 523(a)(2)(B).

> 1.     *The Debtor's statements were in writing.*

To come within the exception of section 523(a)(2)(B), the statement must have been either written by the debtor, signed by the debtor, or written by someone else but adopted and used by the debtor. *See generally* 4 COLLIER ON BANKRUPTCY ¶ 523.08 (16th ed. rev. 2025) (citing *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85 (6th Cir. 1993)).

Here, to obtain the HELOC Loan, the Debtor submitted to the Plaintiff in September 2020 her personal Financial Statement, which purported to disclose all of the Debtor's sources of income, assets & account information, real estate information, liabilities and net worth, among other items. Thereafter, the Debtor submitted to the Plaintiff her Supplemental Information and Loan Application in the summer of 2021 to further corroborate her financial condition. Finally, in connection with the closing of the HELOC Loan, the Debtor submitted to the Plaintiff her Debtor's Certification stating that there were no adverse material changes to the Debtor's financial condition. Each of these documents were in writing and contained materially false statements respecting the debtor's financial condition.

BUCHALTER 106627887v4

2.    *The Debtor's statements were materially false.*

For purposes of section 523(a)(2)(B)(i), a statement is materially false if it portrays a substantially inaccurate or untruthful picture of financial conditions of the debtor or an insider by misrepresenting information of the type that would normally affect the decision to grant credit.  4 COLLIER ON BANKRUPTCY ¶ 523.08 (16th ed. rev. 2025) (citing *In re Bogstad*, 779 F.2d 370 (7th Cir. 1985) (sophisticated debtor's omission of significant contingent liabilities, together with evidence of his extensive business experience, was sufficient to render debt nondischargeable under section 523(a)(2)(B)).  Here, the Financial Statement, the Supplemental Information, the Loan Application, and the Debtor's Certification all contained materially false statements respecting the Debtor's financial condition:

a.    **The Financial Statement.**

As discussed in great detail in Part III.E.1., *supra*, the Debtor failed to disclose to the Plaintiff over $11.3 million in personal liabilities and other critical financial information relevant to the Plaintiff's underwriting process.  Most critically, the Debtor alleged that she had only one liability—a $480,000 loan to Citibank—in her Financial Statement, yet the Debtor actually owed over $11.3 million under four separate loan obligations:  (1) a March 5, 2020 personal guaranty of $4.030 million of debt owed by Cambridge Properties (an undisclosed entity) to Cathay Bank; (2) a June 26, 2020 personal loan obligation in the amount of $497,000 owed to Guaranteed Rate Affinity, LLC; (3) a June 30, 2020 personal loan obligation in the amount of $1.2 million owed to Guaranteed Rate Affinity, LLC, and (4) loans made by GCRI to the Debtor between March 9, 2020 and October 26, 2020 in the total amount of $5.585 million.

The Debtor failed to disclose in the Financial Statement the existence of the Pemberley Trust—an offshore Cayman Islands trust outside of the Plaintiff's reach—through which she owned and would further acquire multiple U.S. and offshore entities and properties and through which she would incur tens of millions of dollars in personal debt.  The Debtor also failed to disclose the four other PFS Undisclosed Entities, which included:  (1) Zephyr Management, which the Debtor would ultimately transfer to the Pemberley Trust and Bui Revocable Trust and would

own and control most of the Debtor's offshore entities and real properties; (2) Khloris Bio, a failed biosciences startup that drained the Debtor's non-salary cash flow that she represented would be available to service the HELOC Loan, (3) LeSoleil, a now-defunct solar panel startup that the Plaintiff invested $4 million into only months before submitting her Financial Statement; and (4) Cambridge Properties, which owned the Los Gatos Property (an undisclosed property), for which the Debtor failed to disclose her personal guaranty of $4,030,000 of indebtedness.

Finally, the Debtor failed to disclose her ownership interest in three real properties (*i.e.*, the PFS Undisclosed Properties). The Financial Statement only disclosed an interest in the Saratoga Property, the San Diego Property, and the Danville Property. At the time the Debtor submitted the Financial Statement, she directly owned through the Bui Revocable Trust the Kihei Property and the Santa Monica Property, which she failed to disclose in the Financial Statement. Finally, the Debtor also failed to disclose the Los Gatos Property that she had an interest through her ownership of Cambridge Properties (*i.e.*, one of the PFS Undisclosed Entities).

The Financial Statement represented that the Debtor had a net worth of $8,837,000; however, the failure to include $11.3 million in debt obligations, five entities and three properties dramatically calls into question that net worth figure. In executing and submitting the Financial Statement, the Debtor "guarantee[d] its accuracy with the intent that it be relied upon by the bank in extending credit. Snell Decl., Exh. 1 at p. 5. The Debtor further stated that "I warrant that I have no known obligations, direct or contingent, which have not been included herein and that I have not knowingly withheld any material information of an adverse nature." *Id.*

> **b.  The Loan Application, the Supplemental Information, and the Debtor's Certificate.**

As discussed in greater detail in Part III.E.2., *supra*, the Debtor failed to disclose in the Loan Application and the Supplemental Information the additional obligations that she directly or indirectly incurred and the entities and properties that she directly or indirectly obtained after the September 3, 2020 submission of the Financial Statement and prior to the August 9, 2021 execution of the Debtor's Certificate and the Loan Agreement.

The Financial Statement obligated the Debtor to "notify the bank immediately, in writing, of any unfavorable change in [her] financial condition." Snell Decl., Exh. 1 at p. 5. The Debtor had several opportunities to do so in connection with her HELOC Loan application process. On June 1, 2021 the Debtor submitted a written Loan Application and, thereafter, the Supplemental Information. Finally, on August 9, 2021, the Debtor executed the Debtor's Certification along with the Loan Agreement and other Loan Documents. At each point in time, the Debtor was under a duty to notify the Plaintiff of the PFS Undisclosed Entities, the PFS Undisclosed Properties, and, most significantly, the PFS Undisclosed Liabilities. She failed to do so.

Worse yet between September 3, 2020 and August 9, 2021, the Debtor furthered her fraudulent scheme by forming new entities, acquiring new properties, and incurring new debt. During this time, when the Debtor actively submitted the Loan Application, the Supplemental Information, and the Debtor's Certificate for the Plaintiff's review and reliance, the Debtor acquired ownership or control over four additional entities, three additional real properties and personally obligated herself on five additional loans or guarantees totaling $16.325 million.

These Pre-Funding Undisclosed Obligations included: (1) a December 3, 2020 personal guaranty obligation of $6.965 million in debt owed by Elessar Properties to Santa Cruz County Bank; (2) a March 15, 2021 personal guaranty obligation of $2.6 million of debt owed by Gladdington Properties to CTBC Bank; (3) a May 17, 2021 personal loan obligation of $1 million owed to Santa Cruz County Bank; (4) a July 29, 2021 personal loan obligation of $5 million owed to United Business Bank; and (5) a July 29, 2021 personal guaranty obligation of $760,000 in debt owed by Gladdington Properties to Redwood Mortgage.

These Pre-Funding Undisclosed Entities included: (1) Elessar Properties, which owned the Gilroy Property (an undisclosed property) for which the Debtor personally guaranteed $6.965 million owed to Santa Cruz Bank; (2) Gladdington Properties, which owned the Milpitas Property (an undisclosed property) for which the Debtor personally guaranteed $2.6 million to CTBC Bank and $760,000 to Redwood Mortgage; (3) Atlas Capital, which owned the Fontanoso Property, and (4) Vintage Point, which owned the Milvia Berkeley Property (an undisclosed property). Finally,

28

the Pre-Funding Undisclosed Properties included:  (1) the Gilroy Property, a commercial property owned by Elessar Properties; (2) Milpitas Property, a commercial property owned by Gladdington Properties; and (3) Milvia Berkeley Property, which she had an interest through her indirect ownership of Vintage Point.

When it came time for the Debtor to submit her Debtor's Certificate, the Debtor failed to provide any information regarding the materially adverse change in her financial condition as required by the Financial Statement and the Plaintiff's Loan Documents.  Specifically, the Debtor's Certificate included a certification that the Debtor wasn't aware of any "Adverse Material Change" to her financial circumstances.  *See* Part III.D, *supra*, at ¶ 29.  It would be beyond belief for the Debtor to claim that she was unaware of incurring a personal loan obligation in the amount of $5 million due to United Business Bank less than two weeks prior to signing the Debtor's Certificate.

3.    *The statements involved the financial condition of the Debtor and her insiders.*

The Supreme Court in *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018), held that a statement is "respecting" a debtor's financial condition if "it has a direct relation to or impact on the debtor's overall financial status" and that "[a] single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not."  *Id.* at 1761.  Here, the Financial Statement, the Loan Application, the Supplemental Information, and the Debtor's Certificate each involved the income, expenses, assets and liabilities of the Debtor and her "insiders," as such term is defined under section 101(31)(A).

4.    *The Plaintiff reasonably relied on the statements in extending credit.*

The "reasonable reliance" standard under section 523(a)(2)(B) is a more stringent standard than the "justifiable reliance" standard of section 523(a)(2)(A).  *See Field v. Mans*, 516 U.S. 59, 77 (1995); *see also Appling*, 138 S. Ct. at 1763 ("The text of § 523(a)(2) plainly heightens the bar to discharge when the fraud at issue was effectuated via a 'statement respecting the debtor's financial condition.'").  Courts evaluate the reasonableness of a creditor's reliance in light of the

totality of the circumstances.  *See Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261

(5th Cir. 1993).  In *Coston*, the Fifth Circuit stated that the court may consider among other things,

> whether there had been previous business dealings with the debtor that gave rise to
> a relationship of trust; whether there were any "red flags" that would have alerted
> an ordinarily prudent lender to the possibility that the representations relied upon
> were not accurate; and whether even minimal investigation would have revealed
> the inaccuracy of the debtor's representations.

*Id.* (citing *In re Ledford*, 970 F.2d 1556, 1560 (6th Cir.1992) (setting forth circumstances that may

be considered in context of section 523(a)(2)(A) reasonableness of reliance determination)).

Here, when the Plaintiff evaluated the Debtor's financial condition, it did so in accordance

with its general loan procedures.  The Plaintiff verified the Financial Statement and the Loan

Application via the Supplemental Information, a credit report, title searches on the Saratoga

Property and other standard due diligence.  The Debtor established a relationship with the Plaintiff

in September 2020 and had been in the process of seeking approval for the HELOC Loan for over

nine months prior to closing the HELOC Loan.  Had the Plaintiff known the true state of the

Debtor's financial condition at any point in time prior to the funding of the HELOC Loan, the

Plaintiff would not have extended credit to the Debtor.

     5.    *The Debtor made the fraudulent statements and omissions with the
intention of deceiving the Plaintiff.*

Section 523(a)(2)(B)(iv) requires that the debtor caused the materially false statement to

be made or published with the intent to deceive.  Here, there is no doubt that the Debtor caused

the Financial Statement, the Loan Application, the Supplemental Information and the Debtor's

Certificate to be published.  She executed and submitted to the Plaintiff the Financial Statement,

the Loan Application and the Debtor's Certificate.  Further, she provided the Plaintiff with the

Supplemental Information to corroborate the information previously provided to the bank.

Regarding the second component (*i.e.*, intent to deceive), it must be shown that the debtor's alleged

false statement in writing was either knowingly false or made so recklessly as to warrant a finding

that the debtor acted fraudulently.  *See Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1119

(3d Cir. 1995) (holding that "a creditor can establish intent to deceive by proving reckless

indifference to, or reckless disregard of, the accuracy of the information in the financial statement of the debtor when the totality of the circumstances supports such an inference."); *see also Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167 (6th Cir. 1985) ("The standard . . . is that if the debtor either intended to deceive the Bank or acted with gross recklessness, full discharge will be denied.").

Here, the Debtor signed the Financial Statement, the Loan Application, and the Debtor's Certificate and submitted them to the Plaintiff with materially false information.  In the years prior to the Financial Statement, the Debtor obligated herself directly or indirectly through guarantees to third-parties in the total amount of $11.3 million.  In the nine months following the submission of the Financial Statement and the execution of the Debtor's Certificate, the Debtor obligated to third-parties either directly or indirectly through guarantees in the total amount of $16.325 million. The Debtor was in the midst of the early stages of orchestrating a fraudulent scheme premises on acquiring properties and entities and transferring them to foreign entities outside of the reach of her creditors.  The Debtor's failure to disclose over $27 million in debt obligations prior to the funding of her HELOC Loan was no mere accident.  The Debtor was intent on amassing as much debt as possible in order to fund her fraudulent scheme.

For the foregoing reasons, the Plaintiff is entitled to entry of a nondischargeable judgment pursuant to section 523(a)(2)(B).

### C.    The Plaintiff is entitled to summary judgment under section 523(a)(2)(A).

A debt will be declared nondischargeable if a creditor can meet the requirements of section 523(a)(2)(A), which incorporates common law fraud principles.  *Field v. Mans*, 516 U.S. 59, 70 n. 9 (1995).  "Courts have generally interpreted [Section] 523(a)(2)(A) to require traditional elements of common law fraud."  *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998).  Further, the Supreme Court has stated the phrase "to the extent obtained by" is broad and "does not impose any limitation on the extent to which 'any debt' arising from fraud is excepted from discharge."  *Brown v. Ables (In re Ables)*, 302 B.R. 917, 921 (Bankr. M.D. Fla. 2003) (Williamson, J.) (quoting *Cohen v. De La Cruz*, 523 U.S. 213, 218, 140 L. Ed. 2d 341, 118

31

S. Ct. 1212 (1998)).  "Once it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge."  *Id.*  Therefore, to prove that its debt is non-dischargeable under Section 523(a)(2)(A), a creditor must prove that:

1)      The debtor made a false representation to deceive the creditor;

2)      The creditor relied on the misrepresentation;

3)      The reliance was justified; and

4)      The creditor sustained a loss as a result of the misrepresentation.

*In re Bilzerian*, 153 F.3d at 1281.

1.      *The Debtor's misrepresentations and fraudulent scheme.*

The Debtor made several material misrepresentations to the Plaintiff in connection with her efforts to obtain the HELOC Loan.  While there were certainly misrepresentations respecting the false and undisclosed PFS Undisclosed Entities, PFS Undisclosed Real Properties and PFS Undisclosed Obligations in the Financial Statement and Supplemental Information, as well as the Pre-Funding Undisclosed Entities, the Pre-Funding Undisclosed Real Properties and the Pre-Funding Undisclosed Obligations in the Loan Application, Supplemental Information, and the Debtor's Certificate.

However, the Debtor's "misrepresentations" go beyond statements about her financial condition.  The Debtor concealed her scheme to obtain the HELOC Loan with the intent of dissipating the proceeds into (i) investments in multiple new business ventures that were speculative and largely unrelated to her career as a physician, but also multiple acquisitions by and transfers of U.S. and foreign real properties to the undisclosed, foreign Pemberley Trust and multiple foreign entities held by the Debtor and the Pemberley Trust, all of which would be outside of the Plaintiff's reach when the Debtor inevitably defaulted on the HELOC Loan.

When the Debtor applied for the HELOC Loan, her Financial Statement failed to disclose the facts that she had, among other things, had already (i) set up the Pemberley Trust and was in the process of transferring ownership of Zephyr Management to it for the ultimate purposes of holding all of her foreign entities and real properties, (ii) invested $4 million in LeSoleil – a solar

panel company – only seven months before then in February 2020, (iii) used Cambridge Properties to acquire the Los Gatos Property and personally guaranteed $5,237,000 of Cambridge Properties' debts.  Further, in the same month that she submitted the Financial Statement, the Debtor formed Vintage Point and Atlas Capital, which she would use to acquire and finance the Berkeley Property and Fontanoso Property, respectively, by the time that the Plaintiff funded the HELOC Loan in the fall of 2021, incurring personal obligations of over $23 million from these two properties alone—in addition to the $27 million in personal and guaranty obligations incurred prior to the funding of the HELOC Loan.

By the fall of 2021, she would form Gladdington Properties and Elessar Properties, acquire and finance the Milpitas and Gilroy Properties and incur an additional $12 million in personal obligations.  By the Petition Date only two years later, the Debtor had created six more entities, acquired and financed seven more real properties, personally assumed seven more loans totaling $4,928,000 personal obligations and twice transferred the Plaintiff's collateral and encumbered it with a $3 million junior lien and her own additional personal guaranty.  The Plaintiff would not have extended the HELOC Loan if it had known that the Debtor had any intention of involving its credit and collateral in her ultimate scheme.

The Debtor also made misrepresentations in creating the impression that her non-salary income from GCRI was available to service the HELOC Loan debt service payments.  The Debtor intentionally provided the Supplemental Information and requested the Plaintiff to consider her net revenues from GCRI, which resulted in $112,624.09 of monthly income.  By supplying the Supplemental Information, the Debtor led the Plaintiff to believe that it could rely on the Debtor's non-salary income to service its debt.  To the contrary, the Debtor was already using its current 2020 non-salary income to fund and finance its scheme to defraud her creditors.

The Supreme Court's decision in *Husky International Electronics, Inc. v. Ritz*, 578 U.S. 355 (2016) is highly instructive in this case.  *Husky* clearly held that "actual fraud" under Section 523(a)(2)(A) doesn't require an affirmative express misrepresentation where a fraudulent scheme

is apparent.  In a scheme that involves fraudulent transfers of assets to hinder, delay and frustrate creditors through concealment is sufficient.  The Supreme Court stated:

> Equally important, the common law also indicates that fraudulent conveyances, although a "fraud," do not require a misrepresentation from a debtor to a creditor. As a basic point, fraudulent conveyances are not an inducement-based fraud. Fraudulent conveyances typically involve "a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration." In such cases, the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt. It is in the acts of concealment and hindrance.

*Ritz*, 578 U.S. at 361-62 (citations omitted).

The case at hand is a classic example of a lender who was kept in the dark about its debtor's plan to use its loan and collateral as part of a dishonest scheme to the lender's detriment.  The Debtor had already begun borrowing against its assets to invest in other assets and ventures and concealed those assets, liabilities and transactions through omissions, misrepresentations and self-settled Bui Revocable Trust, the foreign Pemberley Trust and several subsidiaries.  By the time the Plaintiff extended the HELOC Loan one year later, the Debtor's scheme of financings, acquisitions, transfers and formation of various U.S. and foreign entities had already increased exponentially – including by fraudulently transferring and encumbering the Plaintiff's own collateral – and that scheme clearly continued up until the Debtor filed her Petition.

2.    *The Plaintiff relied on the Debtor's misrepresentations*

The only reason for making such egregious misrepresentations and omitting the Plaintiff from the Debtor's activities was to induce the Plaintiff's reliance, which it did, and to impair and delay the Plaintiff's ability to exercise its rights and remedies under the Loan Documents.  The Plaintiff would not have extended the HELOC Loan if it knew about the Pemberley Trust or *any* of the PFS Undisclosed Entities, PFS Undisclosed Properties, and PFS Undisclosed Liabilities.  Moreover, the Plaintiff would not have extended the HELOC Loan if it knew about the Debtor's active pursuit and implementation of her fraudulent scheme via the Pre-Funding Undisclosed Entities, Pre-Funding Undisclosed Properties, and Pre-Funding Undisclosed Liabilities that were ongoing at the time that the Debtor submitted the Financial Statement, Supplemental Information

34

and Loan Application, executed the Loan Documents and received the proceeds of the HELOC Loan.

3.      *The Plaintiff justifiably relied on the Debtor's misrepresentations.*

In order to prevail, the Plaintiff must prove that its reliance was justified in light of the qualities of the parties and surrounding circumstances. *Field v. Mans*, 516 U.S. at 70-71. Under the justifiable reliance standard, "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as warning that he is being deceived, that he is required to make an investigation of his own." *Id.* at 71-72 (citing Prosser and Keeton on the Law of Torts, § 108 (7th ed. 1985)). The Plaintiff had no reason to believe that the Debtor would use the HELOC Loan and its collateral in a scheme to rapidly finance, acquire and transfer over a dozen U.S. and foreign real properties and other speculative business ventures via an undisclosed foreign trust and multiple to-be-created U.S. and foreign entities, and incurring tens of millions of dollars of personal obligations within a few years after extending the HELOC Loan. The Plaintiff had no access to information suggesting that that was the case.

The Plaintiff expected that the Debtor provided the Financial Statement, Loan Application and Supplemental Information – consisting of the tax returns filed by the Debtor and GCRI in the years prior to the Loan Application – in good faith. The Plaintiff had no evidence of prior bad conduct by the Debtor and would not expect the Debtor to lie on her and GCRI's state and federal tax returns or breach her obligations under the Loan Documents. The Plaintiff justifiably relied on the Debtor's representations in extending the HELOC Loan.

4.      *The Plaintiff sustained a significant loss as a result of the Debtor's misrepresentations.*

It is indisputable that the Plaintiff was induced by the Debtors misrepresentations and omissions and her dishonest scheme to rapidly finance, acquire and transfer over a dozen real properties in the U.S., Cayman Islands and Australia using an undisclosed foreign trust and a network of undisclosed and to-be-formed U.S. and foreign entities, incurring tens of millions of

35

dollars in debt and fraudulently transferring and encumbering the Plaintiff's own collateral. There can be no doubt that the Debtor's misrepresentations, omissions and fraudulent scheme led to the Plaintiff's losses. If the Debtor had disclosed the Pemberley Trust, the PFS Undisclosed Entities, the PFS Undisclosed Properties, and the PFS Undisclosed Liabilities, or the subsequent Pre-Funding Undisclosed Entities, the Pre-Funding Undisclosed Properties, and the Pre-Funding Undisclosed Liabilities, the Plaintiff would have had some opportunity to understand the Debtor's actual financial condition and the actions it was taking in furtherance of its scheme and evaluate them when considering the HELOC Loan.

Instead, the Debtor took $2.61 million from the Plaintiff that it couldn't repay because of her actions and fraudulent scheme. The Debtor used the income that she proffered in the Supplemental Information to inflate her total gross monthly income to obtain the HELOC Loan and used it to fund her myriad ventures and transactions. The Debtor transferred the Saratoga Property from the Bui Revocable Trust to LBS Associates and then to herself and further encumbered it with a junior lien securing an even larger loan, in violation of the Loan Documents. The Plaintiff had now dealt with title and marketability issues, a loan that is in default, and a chapter 11 Bankruptcy Case that has stayed the Plaintiff from exercising its rights and remedies against its collateral and the Debtor—a case that has been pending for over two years and has required an examiner and appointment of a chapter 11 trustee because of the mess created by the Debtor's dishonesty. The Plaintiff has continued to incur interest, costs, attorney's fees and other damages that are difficult to quantify at this stage.

For the foregoing reasons, the Plaintiff is entitled to entry of a nondischargeable judgment pursuant to section 523(a)(2)(A).

### D.   The Debtor's debt is nondischargeable under section 523(a)(6).

A creditor can obtain a nondischargeable judgment under section 523(a)(6) for a debt that arises from a "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "We have held that proof of "willfulness" requires 'a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the

rights of another.' '[A] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury.'" *In re Jennings*, 670 F.3d 1329, 1334 (11th Cir. 2012) (quoting *In re Walker*, 48 F.3d 1161, 1163, 1165 (11th Cir.1995) (internal citations omitted)); *see also Kawaauhau v. Geiger*, 523 U.S. 57 (1998). "As to the "malicious" prong, we have defined that term as used in section 523 as 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *In re Ikner*, 883 F.2d 986, 991 (11th Cir. 1989) (quoting *In re Latch*, 820 F.2d 1163, 1166 n.4 (11th Cir. 1987) (citation omitted)). "Special malice need not be proved, *i.e.*, a showing of specific intent to harm another is not necessary. Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice." *Id*. Furthermore, a transfer of collateral in breach of a security agreement is actionable under section 523(a)(6) when the defendant's conduct is knowing and certain to cause financial harm to the creditor. *U.S. v. Recker*, 180 B.R. 540 (Bankr. E.D. Mo. 1995).

Here, the Debtor's actions were both willful and malicious. The Debtor intentionally misrepresented her assets and liabilities when she submitted the Financial Statement, the Loan Application, the Supplemental Information, and the Debtor's Certificate, and further failed to disclose the multiple new entities, real property acquisitions and indebtedness she was incurring while she was applying for and received approval for the HELOC Loan, executed the Loan Documents and received $2.61 million in loan proceeds from the Plaintiff. There can be little doubt that the Debtor acted with specific intent and knew that her failure to disclose her actual assets, liabilities, interests and transactions that she was actively pursuing when she was applying for the HELOC Loan would result in certain harm to the Plaintiff.

As discussed in great detail above, when the Debtor initially applied for the HELOC Loan she failed to disclose ownership interests in five entities, three properties, and four loan or guaranty obligations totaling over $11.3 million. Prior to the closing of the HELOC Loan, the Debtor failed to disclose ownership interests in four entities, three properties, and five loan or guaranty obligations totaling over $16.3 million. Finally, after the closing of the loan, the Debtor proceeded

to expand upon her fraudulent scheme and incurred an additional $25 million in director loan or personal guaranty obligations.

Additionally, after the Debtor obtained the HELOC Loan, she had – without the Plaintiff's knowledge or consent – transferred the Plaintiff's collateral from the Bui Revocable Trust to LBS Associates, her defunct consulting entity, and then into her own name.  Only a few weeks later, she personally borrowed $3 million from Kelly Mortgage and gave a security interest on the Plaintiff's collateral to secure that debt (which primed the Plaintiff's security interest), again, without the Plaintiff's knowledge or consent.

The Plaintiff would not have extended the HELOC Loan if it had known that the Debtor had any intention of involving its credit and collateral in her ultimate scheme.  The Debtor knew that the Plaintiff would not have loaned her $2.61 million if she disclosed the full extent of her assets, liabilities, network of trusts and entities (foreign and domestic) and active pursuit of new investments, acquisitions and financings.  By withholding this information and her intentions, the Debtor intentionally deprived the Plaintiff of the opportunity to even investigate these things and protect itself from the economic harm that it was certain to – and did – incur.

For these reasons, the Plaintiff's Claim should be determined to be nondischargeable under Section 523(a)(6).

## V.    CONCLUSION

WHEREFORE, the Plaintiff respectfully requests that the Court grant the Motion and enter judgment against the Debtor as follows:

1.    Against the Debtor in favor of the Plaintiff in the full amount of its Claim plus attorneys' fees and costs and post-judgment interest allowable under federal law, and that such judgment be determined to be nondischargeable under section 523(a)(2)(A) and (B) and (a)(6);

2.    In the alternative, if the Court does not find that the Plaintiff is entitled to full judgment against the Debtor, the Plaintiff requests that the Court enter partial summary judgment in favor of the Plaintiff and against the Debtor for each of the elements under required by section

523(a)(2)(A) and (B) and (a)(6) for which the Plaintiff has established that no genuine issues of material fact exist; and

      3.      Grant such other relief as is just and proper.

DATED: December 1, 2025                                 BUCHALTER, A Professional Corporation

                                             By:     */s/ Anthony J. Napolitano*
                                             ANTHONY J. NAPOLITANO
                                             (admitted *pro hac vice*)
                                             Buchalter, a Professional Corporation
                                             1000 Wilshire Boulevard, Suite 1500
                                             Los Angeles, CA 90017-2457
                                             Telephone:  (213) 891-0700
                                             Facsimile:  (213) 896-0400
                                             anapolitano@buchalter.com

                                             Counsel for the Plaintiff ZIONS BANCORPORATION, N.A. d/b/a CALIFORNIA BANK & TRUST

                                             JASON E. GOLDSTEIN
                                             (Florida Bar No.: 526991)
                                             Buchalter, A Professional Corporation
                                             18400 Von Karman Avenue, Suite 800
                                             Irvine, CA 92612-0514
                                             Telephone: (949) 760-1121
                                             Facsimile: (949) 720-0182
                                             jgoldstein@buchalter.com

                                             Local Counsel for the Plaintiff ZIONS BANCORPORATION, N.A. d/b/a CALIFORNIA BANK & TRUST